Anthony T. LEE, et al., Plaintiffs–
Appellants,

United States of America, Plaintiff–
Intervenor, Appellee,

National Education Association,
Inc., Plaintiff–Intervenor,

v.

ETOWAH COUNTY BOARD OF
EDUCATION, Defendant–
Appellee.

Anthony T. LEE, et al., Plaintiffs–
Appellants,

United States of America, Plaintiff–
Intervenor, Appellee,

National Education Association,
Inc., Plaintiff–Intervenor,

v.

SYLACAUGA CITY BOARD OF
EDUCATION, Defendant–
Appellee.

Anthony T. LEE, et al., Plaintiffs–
Appellants,

United States of America, Plaintiff–
Intervenor, Appellee,

National Education Association,
Inc., Plaintiff–Intervenor,

v.

TALLADEGA CITY BOARD OF
EDUCATION, Defendant–
Appellee.

Nos. 88–7551 to 88–7553.

United States Court of Appeals,
Eleventh Circuit.

June 4, 1992.

Julius L. Chambers, Norman J. Chachkin and Janell M. Byrd, New York City, for plaintiffs-appellants.

Frank W. Donaldson, U.S. Atty., Caryl Privett, Asst. U.S. Atty., Birmingham, Ala., Ralph D. Gaines, Jr., Gaines, Gaines &

Gaines, P.C., George Douglas, Jr., Talladega, Ala.

James E. Turnbach, Pruett, Turnbach & Warren, P.C., Gadsden, Ala., Louise A. Lerner, David K. Flynn, Civ. Rights Div. Dept. of Justice, Washington, D.C., and Donald B. Sweeney, Jr., Rives & Peterson, Birmingham, Ala., for defendants-appellees.

Before TJOFLAT, Chief Judge, CLARK *, and SMITH **, Senior Circuit Judges.

TJOFLAT, Chief Judge:

This opinion addresses the merits of three consolidated appeals,[1] each of which derives from a class action brought in 1963 by black parents of school-age children to challenge racial segregation and discrimination in the public schools of Macon County, Alabama. The defendants in these cases are the Etowah County Board of Education (Etowah County) (No. 88–7551), the Sylacauga City Board of Education (Sylacauga City) (No. 88–7552), and the Talladega City Board of Education (Talladega City) (No. 88–7553).

In August 1963, the United States District Court for the Middle District of Alabama ordered the public schools in Macon County desegregated. *Lee v. Macon County Bd. of Educ.*, 221 F.Supp. 297 (M.D.Ala.1963). The following year, the plaintiffs filed a supplemental complaint alleging that the Alabama State Board of Education had asserted control over the public schools in Alabama in order to thwart desegregation efforts. The complaint also challenged dual school systems throughout Alabama and sought a court order requiring statewide desegregation of the public schools. Following extensive litigation, a three-judge district court concluded that a dual school system based upon race was operated throughout Alabama and that it was the policy of the state to promote and encourage such a dual system. *Lee v. Macon County Bd. of Educ.*, 231 F.Supp. 743, 750 (M.D.Ala.1964). The district court enjoined the Alabama State Board of Education, the Governor of Alabama, and other state officials from interfering with federal court orders requiring the elimination of racial discrimination in the Alabama public school system. *Id.* at 758. The court declined at that time, however, to order state-wide desegregation. *Id.* at 756.

In 1966, because Alabama's public schools remained overwhelmingly segregated, the plaintiffs filed supplemental complaints seeking a state-wide desegregation order and further injunctive relief prohibiting the use of state funds to support the dual system. In 1967, the district court found that the State Board of Education and the Alabama Superintendent of Education continued to interfere with the desegregation of the public schools in Alabama and that the state continued to operate a dual public school system based upon race. The district court ordered each of the school systems in Alabama, including the three school systems subject to the present appeals, to disestablish its dual system and required each system to adopt a desegregation plan for all grades commencing with the 1967–68 school year. *Lee v. Macon County Bd. of Educ.*, 267 F.Supp. 458, 480–82 (M.D.Ala.1967).[2] Accordingly, the defendants each implemented a desegregation plan consistent with the guidelines mandated by the district court's 1967 order.

---

* *See* Rule 34–2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

** Honorable Edward S. Smith, Senior U.S. Circuit Judge for the Federal Circuit, sitting by designation.

1. By order of this court on December 1, 1988, appeals Nos. 88–7471, 88–7551, 88–7552, and 88–7553 were consolidated. Because of the uniqueness of appeal No. 88–7471, we have addressed the issues raised by that appeal in a separate opinion. *See Lee v. Talladega County Bd. of Educ.*, 963 F.2d 1426 (11th Cir.1992).

2. On April 15, 1970, the district court transferred jurisdiction over each school system to the district court of the district in which the school system is located. As a result, the litigation involving the three school systems subject to these appeals was transferred from the Middle District of Alabama to the Northern District.

After the desegregation plans had been in effect for several years, the district court issued orders in each case now before us to show cause whether the detailed regulatory orders enjoining the defendants should be dissolved and replaced with general "permanent" injunctions. Subsequently, the court issued orders stating that each defendant was operating a unitary[3] school system, dissolving the prior regulatory injunctions, and replacing them with general "permanent" injunctions.[4] Finally, the district court placed the cases against all three defendants on the inactive docket subject to reactivation on proper application by any party, or on the court's own motion, should it appear that further proceedings were appropriate.[5]

On October 23, 1987, the district court reactivated the cases on its own motion and ordered the parties to show cause why the court should not find that the defendants' school systems each had achieved and maintained unitary status, and, as a consequence, dismiss the cases. Following the court's order, the plaintiffs posed interrogatories to the defendants, which were answered. The parties then filed various responses to the court's show cause order. The plaintiffs submitted a consolidated response addressing the status of all three school systems and stating that the defendants' answers to their interrogatories indicated that none of the school systems had

achieved unitary status. The United States, as plaintiff-intervenor, also filed a consolidated response asserting its belief that the defendants had not engaged in segregative conduct during the past several years. Further, the United States argued that it was "appropriate for the Court to terminate all jurisdiction over these school districts, dissolve any injunctions, and dismiss the action as to them...." In its response, defendant Talladega City stated that it knew of no reason why its case should not be dismissed and that it was operating and would continue operating a unitary school system. Defendant Sylacauga City filed a one sentence response asking the court to find that it had achieved unitary status and to dismiss its case. Defendant Etowah County did not respond to the district court's show cause order.

On March 1, 1988, the district court held a hearing on the matter. The transcript of this hearing reveals that it was akin to a pre-trial conference addressing, among other matters, the plaintiffs' discovery efforts, and the applicable burdens of proof. After the plaintiffs had declared that they had failed to appreciate the evidentiary nature of the hearing or their burden of proof, the district court requested that the plaintiffs submit in writing their reasons for objecting to a dismissal of these cases, and that the defendants respond to the plaintiffs'

3. Much confusion has arisen from the use of the terms "unitary" and "unitary status." In *Georgia State Conference of Branches of NAACP v. Georgia*, 775 F.2d 1403, 1413 n. 12 (11th Cir. 1985), this court defined a "unitary" school system as one that "has not operated segregated schools as proscribed by cases such as *Swann [v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971)] ... for a period of several years." The court stated that a school system that "has achieved unitary status is one which is not only unitary but has eliminated the vestiges of its prior discrimination and has been adjudicated as such through the proper judicial procedures." *Id.* This court later rejected this labeling system and argued that the term "unitary" should be used "only when referring to the status that a school board must achieve to be freed from district court jurisdiction." *Pitts v. Freeman*, 887 F.2d 1438, 1445 n. 7 (11th Cir.1989), *rev'd on other grounds*, — U.S. —, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992).

To minimize confusion, we discourage the future use of the term "unitary" to describe a system that has not eliminated vestiges of past discrimination to the extent practicable but is merely currently in compliance with a court-imposed desegregation plan; nevertheless, we assume for the purposes of this opinion that the district court used the term "unitary" at this stage of this litigation to convey just such a meaning.

4. The general injunctions state that defendants are "permanently enjoined from operating a dual system of racially identifiable schools," and prohibit actions affecting students, faculty, staff, school construction, and student transfers that would result in the reoccurrence of a dual school structure.

5. These orders were entered on July 25, 1974, for Etowah County; July 12, 1974, for Sylacauga City; and December 16, 1976, for Talladega City.

objections. The court stated that it would review the parties' submissions and would then determine whether an evidentiary hearing was necessary. Also, the court cut off further discovery.

On March 10, 1988, the court issued an order reiterating its request at the March 1 hearing and directing the plaintiffs to file supplemental materials setting forth "specific objections they may have, if any, together with appropriate factual support, relating to the possible declaration of unitary status and dismissal" of these cases. The order also afforded the defendants the opportunity to respond. The parties were notified that they could submit relevant proof in the manner prescribed by Fed. R.Civ.P. 56(e).[6] Finally, the order reiterated the district court's decision at the March 1 hearing prohibiting further discovery.

On April 9, 1988, the plaintiffs filed materials in compliance with the court's March 10 order. The plaintiffs urged that the district court retain jurisdiction and active supervision of the cases, that the defendants be required to file status reports with the court for three consecutive years, and that the court, at the end of that time should hold a hearing to determine if the defendants had achieved unitary status.

In support of their arguments, the plaintiffs proffered evidence "in opposition to a finding of unitariness." With regard to Etowah County, the plaintiffs noted a disparity in the percentage of black teachers within the system in relation to the percentage of black persons in the county. With regard to Sylacauga City, the plaintiffs proffered facts in support of the proposition that the school system had displayed a pattern of racial discrimination in student discipline. The plaintiffs also set forth facts suggesting that in the thirteen years since the district court placed the case on the inactive docket, there had been a substantial decrease in the percentage of black teachers in the school system. Finally, with regard to Talladega City, the plaintiffs noted facts indicating that the percentage of minority teachers in the school system had declined consistently since 1970.

Etowah County responded to the plaintiffs' charges by arguing that the disparity between the percentage of black teachers and the percentage of black persons in the county was much less than that suggested by the plaintiffs, and that "an incredibly low number of blacks" had applied for teaching positions within the Etowah County system. In response to the plaintiffs' evidence, Talladega City asserted that it was doing everything possible to attract minority teachers but that it had experienced difficulty in doing so. Sylacauga City failed to file a response to the court's March 10 order. The United States filed a separate but similar response for each school system. It stated in each response that, in view of the information submitted, the school system should be declared to have achieved unitary status and the case should be dismissed.

On July 8, 1988, without a further hearing, the district court entered an order and memorandum opinion dismissing the action with respect to each of the school systems, dissolving all injunctions previously entered, and terminating its jurisdiction. The plaintiffs now appeal. We reverse the district court's orders and remand for a full evidentiary hearing as to the unitary status of each school system.

## I.

The plaintiffs' first claim on appeal is that the district court improperly dismissed these cases without allowing them the opportunity to conduct adequate discovery to develop the full factual record in support of their claims. Discovery matters are committed to the discretion of the district court; therefore, we review the district court's decision to terminate discovery under an abuse of discretion standard. *Patterson v. United States Postal Serv.*, 901 F.2d 927, 929 (11th Cir.1990). Upon review of the record, we conclude that the

---

**6.** Fed.R.Civ.P. 56(e) provides for the submission of affidavits, depositions, and answers to inter-rogatories in a summary judgment proceeding.

district court did not abuse its discretion by terminating discovery when it did.

The plaintiffs were granted four months to conduct discovery during which time they posed a total of thirteen interrogatories and took no depositions. Further, they indicated in their January 26, 1988 response to the district court's show cause order that conducting additional discovery would not require a postponement of the March 1, 1988 hearing date. At the March 1 hearing, the district court stated that it would not allow further discovery. The plaintiffs did not object at that time to the termination of discovery. Not until April 9, 1988, when the plaintiffs filed their response to the district court's March 10 order, did the plaintiffs request additional discovery. The plaintiffs stated at that time that they had taken discovery only on the issue of unitary status and that they now wished to take discovery on the issue of whether, assuming that the school systems had achieved unitary status, the district court nevertheless should decline to dissolve the "permanent" injunctions imposed upon the defendants. The plaintiffs did not disclose what they hoped to discover but only expressed their belief that "they would be unduly prejudiced by [the court's] deciding the issue regarding permanent injunctive relief unless additional discovery is allowed."

The record before us demonstrates that the district court did not abuse its discretion by denying the plaintiffs' April 9 request for additional discovery. The plaintiffs themselves are primarily responsible for any prejudice they may have suffered from inadequate discovery. They failed to conduct discovery diligently during the four months when they were free to do so. Moreover, their request for additional discovery was quite tardy, coming as it did one day before the deadline that the district court had set for the plaintiffs to comply with its March 10 show cause order. Further, in light of the plaintiffs' failure to specify the type of information they hoped to obtain through additional

discovery, the district court was justified in giving little weight to their asserted belief that they would be unduly prejudiced by a cut-off of discovery. Finally, we note that the Supreme Court has held that federal judicial control over a school system cannot extend beyond the achievement of unitary status. *See Board of Educ. of Oklahoma City Pub. Schs. v. Dowell,* —— U.S. ——, ——, 111 S.Ct. 630, 636–37, 112 L.Ed.2d 715 (1991). Thus, the plaintiffs' argument that the district court should decline to dissolve all injunctions outstanding in these cases even if the school system has achieved unitary status could not have been advanced by any information that the plaintiffs might have obtained through additional discovery.

## II.

The plaintiffs' second contention on appeal is that the district court, in dismissing the cases against the defendants, failed to follow the procedures this court has established for terminating a school desegregation case. The plaintiffs argue that the procedures for terminating a school desegregation case in this circuit were set out in *Youngblood v. Board of Pub. Instruction,* 448 F.2d 770 (5th Cir.1971).[7] In *Youngblood,* the district court *sua sponte* had dismissed a school desegregation case after finding that the school system in question was desegregated and unitary in nature. The Fifth Circuit vacated the dismissal and directed the district court to retain jurisdiction over the case for a period of not less than three years, during which time the school board was to submit semi-annual reports to the court including such information as the number and race of the students at each school in the system; the number and race of faculty members at each school in the system; the requests made under the majority to minority transfer provision of the court's desegregation order and the action taken in response to those requests; and whether facilities and transportation systems were being operated on a desegre-

---

7. In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

gated basis. *Id.* at 771 (citing *United States v. Hinds County Sch. Bd.*, 433 F.2d 611, 618–19 (5th Cir.1970). The Fifth Circuit further directed:

> At the conclusion of three school years the District Court should again consider whether the cause should be dismissed. In no event, however, shall the District Court dismiss the action without notice to the plaintiffs ... and a hearing providing opportunity to plaintiffs ... to show cause why dismissal of the cause should be further delayed.

*Id.*

■ Subsequent cases have reiterated that a previously segregated school system does not become desegregated so as to achieve unitary status and be relieved of court supervision simply by implementing a desegregation plan. *See, e.g., Pitts v. Freeman*, 755 F.2d 1423, 1426 (11th Cir. 1985). Rather, the district court must retain jurisdiction for a period of time after the school system has implemented a desegregation plan to ensure proper implementation of the plan, to guard against the possibility of recurring constitutional violations, and to ensure the achievement of the ultimate goal—a unitary public school system in which the state does not discriminate between children on the basis of race. *Lee v. Macon County Bd. of Educ.*, 584 F.2d 78, 81 (5th Cir.1978). After a period of time sufficient to achieve these objectives has elapsed—this court has required a period of not less than three years—a district court may terminate a desegregation case by holding a hearing to determine if the school system has achieved unitary status. *United States v. Texas Educ. Agency*, 647 F.2d 504, 508–09 (5th Cir. Unit A 1981), *cert. denied*, 454 U.S. 1143, 102 S.Ct. 1002, 71 L.Ed.2d 295 (1982). The district court should give the plaintiff notice of the hearing and should allow the plaintiff an opportunity to show why the court should continue to exercise jurisdiction. *Pitts*, 755 F.2d at 1426.

The plaintiffs in the present cases complain that the district court did not comply with the procedures this court established in *Youngblood* and *Pitts*. Specifically, the plaintiffs assert that (1) the defendants had not filed reports during the three consecutive years immediately preceding dismissal, or for many years before that; and (2) the court denied the plaintiffs' specific request for an evidentiary hearing. Both claims raise a question of law subject to de novo appellate review. *See Courson v. McMillian*, 939 F.2d 1479, 1486 (11th Cir.1991). We address each in turn.

### A. *Reporting Requirement*

■ The district court's orders in 1974 and 1976 dissolving the 1967 regulatory injunctions in these cases and entering general "permanent" injunctions did not impose a reporting requirement on any of the defendants. Thus, we are not faced with a case where a school board that refuses to comply with a court order seeks to be relieved of court supervision. At the time the district court entered its general injunctions, the plaintiffs did not complain of the court's failure to impose a reporting requirement on the school systems, nor did they complain during the many years the defendants failed to file reports as the cases remained inactive. Nevertheless, the plaintiffs argue that the defendants' failure to file reports with the district court for the three years immediately preceding the court's dismissal of these cases ipso facto should be fatal to the district court's determination that the defendants have achieved unitary status. We disagree.

Neither *Youngblood* nor *Pitts* mandates that a school board file reports with the district court for the three years immediately preceding the court's determination of unitary status. This court's three-paragraph opinion in *Youngblood* merely instructed the district court to retain jurisdiction over the case for three years during which time the school system would be required to file status reports on the state of desegregation in the school system. 448 F.2d at 771. *Youngblood* did not hold that a three-year reporting requirement should be imposed in other desegregation cases nor did the court give a rationale for its decision from which we could infer an intent to impose such a requirement in all cases. Further, this court's more recent

opinion in *Pitts* summarized the procedures for terminating a school desegregation case without mentioning a reporting requirement. 755 F.2d at 1426.

Moreover, the plaintiffs' argument ignores the central point that a reporting requirement is merely one means to an end—the purpose of a reporting requirement is to enable the court and the parties to monitor the school system's compliance with the court's desegregation orders, and to ensure that the case is not terminated while vestiges of prior discrimination that practicably can be eliminated still remain.[8] This purpose is not frustrated by a school system's failure to file reports where, in connection with a show cause proceeding to determine whether the school system has achieved unitary status, the parties and the court are provided with the relevant facts that demonstrate whether the school board has remained in compliance with court orders and has eliminated the vestiges of its prior racial discrimination to the extent practicable.

The record in these cases demonstrates that neither the parties nor the district court were prejudiced by the district court's decision not to require the defendants to file reports for three consecutive years before considering whether the school systems had become unitary. The plaintiffs, in the months preceding the March 1, 1988 show cause hearing, asked for and received from each of the defendants information concerning, among other things, the name, location, and grade structure of each school in the system; the name, race, and experience of each principal in the system; the name, race, and experience of each assistant principal in the system; the number and race of the counselors in the system; the number, race, and position of each support worker in the system; the name, race, and length of service of each head basketball, baseball, football, and track coach in the system; the number and race of the students at each school in the system; the number and race of the

faculty members at each school in the system from 1970 to 1988; and whether there was a majority to minority transfer policy in the system. The plaintiffs' supplemental interrogatories requested information for the school years 1985–86 through 1987–88 concerning the use of ability or achievement grouping, including the race of the students placed in each such group. The school systems furnished the plaintiffs with all the requested information.

The type of information that the plaintiffs in the present cases were able to obtain through discovery is similar to the type of information that the defendants in *Youngblood* were ordered to file in reports with the district court. *See Youngblood,* 448 F.2d at 771. We decline to adopt a rule that would elevate form over substance and would require us to vacate the district court's finding of unitary status simply because the information provided to the plaintiffs and the district court was provided pursuant to interrogatories rather than pursuant to a court-imposed reporting requirement. Rather, we hold that where, as here, the parties and the court otherwise have been afforded information from which compliance with a court's orders can be determined, the absence of court-ordered reports does not preclude a finding of unitary status.

### B. *Evidentiary Hearing*

■ The plaintiffs also argue that the procedures used by the district court to terminate these cases were defective because the plaintiffs were not afforded an evidentiary hearing. Again, we disagree. In *Pitts,* this court stated that, "[i]n order to conclude a school desegregation case, a district court must hold a hearing to determine if the school system indeed has achieved unitary status. The plaintiffs should receive notice of the hearing's purpose, and the hearing should give them an opportunity to show why the court should continue to retain jurisdiction." 755 F.2d

---

**8.** In *Board of Educ. of Oklahoma City Pub. Schs. v. Dowell,* —— U.S. ——, ——, 111 S.Ct. 630, 638 112 L.Ed.2d 715 (1991), the Supreme Court stated that a school system may demonstrate compliance with the constitution by showing that it has eliminated the vestiges of its prior discrimination "to the extent practicable."

at 1426 (citations omitted). What is essential is that the district court not terminate a desegregation case before the plaintiffs are afforded an opportunity to demonstrate to the court why the case should not be dismissed. We find that the plaintiffs in the present cases were afforded this opportunity.

The district court's initial order in October 1987 required the parties to show cause, in writing, why the court should not find that each defendant had achieved and maintained unitary status in a racially desegregated school system and, therefore, that the action should be dismissed as to that school system in the manner prescribed by *Pitts*. In its show cause order, the district court set the cases for a hearing and stated that thereafter the cases would be taken under submission on all materials submitted in response to the order. At the March 1, 1988 hearing, the plaintiffs informed the court that they had failed to appreciate the evidentiary nature of the proceeding. The district court, therefore, ordered the plaintiffs to file a response setting forth their specific objections to dismissal in writing and "to submit relevant proof in the manner prescribed by Rule 56(e), Fed.R.Civ.P." Subsequently, the plaintiffs, the United States, the Etowah County Board of Education, and the Talladega City Board of Education filed responses. On the basis of these responses, the district court concluded that the school systems had achieved unitary status and dismissed the cases.

We reject the plaintiffs' contention that a district court may not utilize a summary proceeding in terminating a school desegregation case. The summary judgment proceeding utilized by the district court in these cases afforded the plaintiffs an opportunity to show cause why these cases should not be dismissed. Thus, the district court fully complied with both the letter and the spirit of the *Pitts* hearing requirement.

The plaintiffs further complain that they were not adequately notified that the district court intended to treat the proceedings as if motions for summary judgment had been filed. We reject this complaint as well. As noted above, the district court ordered the parties to submit relevant proof in the manner prescribed by Fed. R.Civ.P. 56—that is, in the manner prescribed for motions for summary judgment. Moreover, the court explicitly stated that it would hold an evidentiary hearing only if its review of the parties' submissions evinced a need for such a hearing. We hold that this notice was adequate.

### III.

The plaintiffs' next contention on appeal is that the district court erred in dismissing the present cases in a summary proceeding because the evidence demonstrated the existence of a genuine issue of material fact regarding the ultimate issue of whether the defendants had achieved unitary status.[9] We agree.

---

**9.** The plaintiffs argue in their briefs to this court that the district court erred in dismissing these cases without stating explicitly that the school systems had eliminated the vestiges of their racially dual and unequal school systems and thus had achieved unitary status. This argument is without merit. The district court's memorandum opinion in each case states that the court ordered the parties to show cause why the court should not find that the defendants' school systems had achieved unitary status. Further, the opinion makes clear that the court focused its unitariness inquiry on "whether the vestiges of discrimination had been eliminated 'root and branch.'" We note that this standard seems to demand a greater showing from the defendants than the standard the Supreme Court subsequently established in *Board of Educ. of Oklahoma City Pub. Schs. v. Dowell*, ⸺ U.S. ⸺,

111 S.Ct. 630, 638, 112 L.Ed.2d 715 (1991) (a district court's unitariness inquiry should focus on whether the school system has "complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination ha[ve] been eliminated to the extent practicable"). After reviewing the plaintiffs' assertions of lingering vestiges of past discrimination, the district court stated that the defendants had been operating a "unitary system" and dismissed each case. The plaintiffs complain that the district court should have used the phrase "unitary status" rather than the phrase "unitary system." The district court's opinion makes clear that it found that the defendants had eliminated the vestiges of their prior discrimination; thus, it is wholly irrelevant what precise language the district court used to announce its findings.

■ Under Fed.R.Civ.P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." An issue is "genuine" only if a reasonable trier of fact, considering the record evidence, could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Our review of a district court's grant of summary judgment is de novo. *Thompson v. Metropolitan Multi–List, Inc.*, 934 F.2d 1566, 1570 (11th Cir.1991). We independently review the record before the district court utilizing the same standards that controlled the district court's determination. *Real Estate Fin. v. Resolution Trust Corp.*, 950 F.2d 1540, 1543 (11th Cir.1992). The evidence and all factual inferences arising from the evidence must be viewed in the light most favorable to the non-moving party. *Useden v. Acker*, 947 F.2d 1563, 1572 (11th Cir.1991).

■ Our inquiry into whether summary judgment is appropriate in these school desegregation cases necessarily begins with an examination of the legal standard and burden of proof relating to the dismissal of a school desegregation case. To terminate a school desegregation case such as the present ones, a court must be satisfied that the school system has complied in good faith with the court's desegregation decree and has eliminated, to the extent practicable, the vestiges of its past *de jure* discrimination. *Dowell*, —— U.S. at ——, 111 S.Ct. at 638. Once a court has found a school system to have operated a racially dual system, the defendant school authority has the burden of proving that it has achieved unitary status—that it has eliminated the vestiges of its dual system to the extent practicable. *Flax v. Potts*, 725 F.Supp. 322, 327 (N.D.Tex.1989). Until the school system is found to have attained

unitary status, the defendant has the burden of proving that any current racial imbalance within the school system is not related proximately to the prior violation. *Freeman v. Pitts*, —— U.S. ——, ——, 112 S.Ct. 1430, 1447, 118 L.Ed.2d 108 (1992); *see also Dayton Bd. of Educ. v. Brinkman*, 443 U.S. 526, 537, 99 S.Ct. 2971, 2979, 61 L.Ed.2d 720 (1979). With all of this in mind, we turn to the issue before this court—whether the record evidence demonstrates a genuine issue of material fact as to the defendants' attainment of unitary status.

## A. Etowah County

■ The plaintiffs proffered evidence showing that while the general population within the Etowah County school system is 1.4% black, only .5% of the teaching faculty in the system is black. Moreover, the plaintiffs argued that this is inexcusable since the population of Etowah County is 15% black. The Etowah Board, in its response to the plaintiffs' submission, argued that the black population in Etowah County is only 2.5% to 5% black and asserted that the fact that only .5% of its faculty is black "is representative not of any discriminatory hiring practice, ... but rather is an example of the incredibly low number of blacks who applied for teaching positions within the Etowah County system...."

The record evidence demonstrates a genuine issue of material fact as to whether Etowah County has achieved and maintained unitary status; a reasonable trier of fact, viewing the evidence in the light most favorable to the plaintiffs, could find that the Etowah County school system has not achieved unitary status. The district court, therefore, erred in granting summary judgment in favor of the Etowah County Board of Education.

## B. Sylacauga City

■ The plaintiffs objected to a finding that Sylacauga City had achieved unitary

---

The plaintiffs further argue that even if the district court did find that the school systems had achieved unitary status, this finding is clearly erroneous. We interpret this contention as an argument that the district court erred in granting summary judgment because there exists a genuine issue of fact regarding the defendants' achievement of unitary status.

status and proffered evidence suggesting racial discrimination with respect to faculty hiring, extracurricular activities, and school discipline. Specifically, the plaintiffs noted that since this case had been placed on the inactive docket, the number of white faculty had increased by 17% while the number of black faculty had decreased by 31%. The plaintiffs also noted a complaint of discrimination filed against the school system with the U.S. Department of Education Office of Civil Rights regarding the removal of a black cheerleader from the Sylacauga High School cheerleading squad. Finally, the plaintiffs proffered evidence that black students within the system were more likely to be suspended from school than were white students within the system. Sylacauga City failed to file a response to the district court's March 10, 1988 show cause order.

The evidence that the plaintiffs offered is sufficient to show that a genuine issue of fact exists as to the unitary status of the Sylacauga City school system. Therefore, the district court erred in granting summary judgment to Sylacauga City.

## C. *Talladega City*

 In regard to Talladega City, the plaintiffs proffered evidence to the district court suggesting discriminatory hiring practices within the Talladega City school system. The evidence showed that in 1970, 32% of the faculty within the school system was black. This percentage had declined steadily over the years since the Talladega City case was placed on the inactive docket and had fallen to 19% in 1988. Talladega City, in its response to the district court's March 10, 1988 order, averred that since 1984 it had sent recruiters to twelve different colleges and universities specifically for the purpose of interviewing minority teacher candidates but had been unable to attract qualified minority faculty.

This record evinces a genuine issue of material fact as to whether Talladega City has complied with all court orders and has

eliminated vestiges of past discrimination to the extent practicable. Thus, the district court erred in granting summary judgment in favor of Talladega City.[10]

## IV.

Based on the foregoing, we REVERSE the order of the district court granting summary judgment to the defendants and dismissing these cases. These cases are REMANDED to the district court for an evidentiary hearing as to the status of each school system.

IT IS SO ORDERED.

---

**10.** The plaintiffs also argue on appeal that even if the district court properly dismissed these cases, the orders "permanently" enjoining the school districts can, and should, remain in effect. In light of our decision that the district court improperly granted summary judgment for the defendants in these cases, we decline to address this issue.